# *UNITED STATES DISTRICT COURT*

DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA

V.

**CHRISTOPHER T. CUSTER**
**CARMEN FIGUEROA**
**DESIREE ALVES**
**WILLIAM TEJEDA**
(Name and Address of Defendant)

## CRIMINAL COMPLAINT

M.J. No.: 04M-1038-JGD

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about December, 2002 through on or about March, 2004 in Barnstable County and elsewhere in the District of Massachusetts, defendants did, (Track Statutory Language of Offense)

unlawfully, knowingly, and intentionally conspire with each other, and others known and unknown, to possess, and to possess with intent to distribute, cocaine, a Schedule II controlled substance,

in violation of Title 21 United States Code, Section 841 and 846.

I further state that I am a Task Force Agent - DEA
Official Title

[illegible]

See Affidavit attached hereto and incorporated by reference herein.

Continued on the attached sheet and made a part hereof: [x] Yes [ ] No

[illegible signature]
Signature of Complainant
[illegible]
Task Force Agent - DEA

Sworn to before me and subscribed in my presence,

3/16/04 at Boston, Massachusetts
Date City and State

JUDITH GAIL DEIN
United States Magistrate Judge
Name and Title of Judicial Officer

Judith Gail Dein
Signature of Judicial Officer

04M-1038-JGD

**AFFIDAVIT OF SEAN E. BALCOM**

I, Sean E. Balcom, being duly sworn, depose and state as follows:

1. I am a Detective-Sergeant for the Barnstable Police Department, and am currently assigned to the United States Drug Enforcement Administration ("DEA") Cape Cod Task Force ("CCTF") as a Federal Task Force Agent. I have been so assigned for the past four years. As a duly deputized Task Force Agent, I am an "investigative or law enforcement officer of the United States" within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516, Title 18, United States Code. Prior to my employment with DEA, I was employed in varying capacities with the Barnstable Police Department for the past 15 years. I have earned a Bachelor's degree in Administration of Justice from Roger Williams University, as well as a Master's degree in Criminal Justice from Anna Maria College.

[illegible] the distribution [illegible], including cocaine, crack cocaine, heroin, and other substances in violation of the federal anti-drug laws, including Title 21, United States Code, Section 846. I have also operated in an undercover capacity in investigations involving the distribution of cocaine

and heroin in and around southeastern Massachusetts. I have also assisted in numerous other investigations in different capacities, such as surveillance, execution of search warrants, execution of arrest warrants and other investigative methods. Those investigations have resulted in arrests and convictions for violations of the drug laws, seizures of drugs, firearms, and real estate, and forfeiture of money, vessels, and motor vehicles.

3. I have received training in the field of narcotics enforcement and investigations from the Massachusetts Criminal Justice Training Council Police Academy, Barnstable, Massachusetts, and graduated in May of 1989. I received basic narcotics training in the Academy, and I have had supplemental training in the recognition and detection of illegal narcotics [illegible] [illegible] level narcotics investigations, confidential informants, search warrants, drug interdiction, [illegible]

[illegible] engaged in the trafficking of illegal drugs. I have also become familiar with the manner in which illegal drugs are transported, stored, and distributed, and with the methods of payment for such

drugs. I am also familiar with various items used to compound, process, deliver and serve as containers for cocaine, heroin, and other controlled substances. Specifically, I am aware that drug traffickers commonly use cellular telephones in furtherance of their drug trafficking activities and frequently change cellular telephone numbers and cellular telephones in an effort to thwart law enforcement's use of electronic surveillance. I also am familiar with the manner in which narcotics traffickers use telephones, coded, veiled, or slang-filled telephone conversations, pagers, coded pager messages, and other means to facilitate their illegal activities. I also am familiar with the vernacular or street-names for users and distributors of controlled substances and the methods by which such persons attempt to disguise the subjects of their conversations and [illegible].

3. I submit this affidavit in support of a criminal complaint charging CHRISTOPHER T. CUSTER ("CUSTER"), CARMEN [illegible] ("[illegible]"), [illegible] [illegible] [illegible] [illegible] [illegible], I believe that there is probable cause to believe that these individuals have committed the said violations in the District of Massachusetts. The defendants are further described as follows:

a. **CUSTER**: CUSTER is a white male who is approximately 5'8" tall and weighs approximately 155 pounds. He has a light complexion, brown hair and brown eyes. It is believed that CUSTER resides at 18 Murphy Road, Hyannis, Massachusetts. CUSTER has a criminal record which includes a conviction in Barnstable District Court on October 17, 2001, for possession with intent to distribute marijuana.

b. **FIGUEROA**: FIGUEROA is a female with a date of birth of April 11, 1979. She uses social security number of 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. Based upon records obtained from the Massachusetts Registry of Motor Vehicles, she is approximately 5'1" tall and resides at 90 Sandwich Road, Apt. 9, Bourne, Massachusetts. FIGUEROA has [illegible] complexion. She utilizes a dark green [illegible] Infiniti Q45, with Massachusetts registration number 3526LP. FIGUEROA has [illegible]

c. **ALVES**: [illegible] approximately [illegible] pounds. ALVES has a date of birth of [illegible] 1[illegible], [illegible] and is assigned social security number 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. It is believed that she resides at 2[illegible] Camp Street, West Yarmouth, Massachusetts. It is believed that ALVES

uses a telephone assigned the number (508) 771-2912 subscribed in her name at 299 Camp Street. ALVES does not have a criminal record.

d. **TEJEDA**: TEJEDA is a Hispanic male, approximately 6 feet tall and at least 200 pounds. He was born on August 15, 1976 and uses social security number 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. It is believed that he resides at 1234 Boston Road, Bronx, New York. He appears to háve no criminal history record.

5. I further submit this Affidavit in support of the issuance of search warrants for the following locations:

a. **18 Murphy Road, Hyannis, Massachusetts**, which is more particularly described in "18 Murphy Road - Attachment A" of the accompanying search warrant application (hereinafter "18 Murphy Road");

b. **299 Camp Street, W. Yarmouth, Massachusetts**, which [illegible] "299 Camp Street [illegible] Attachment A" of the accompanying search warrant application (hereinafter "299 Camp Street"); and,

c. **90 Sandwich Road, Apt. 9, Bourne, Massachusetts**, which is more particularly described in "90 Sandwich Road, Apt. [illegible]

[illegible] FIGUEROA's [illegible] Apt. [illegible], FIGUEROA reported her [illegible] to the Bourne Police Department on February 15, 2004 as Apt. 9-D. A Bourne detective assigned to this investigation reported to the premises on February 15, 2004, and spoke with FIGUEROA in her apartment. He reported that the door to the apartment was identified with the number "9." He also reported that FIGUEROA's apartment was the only one identified with the number "9."

    d. **110 LaFrance Avenue, Hyannis, Massachusetts**: which is more particularly described in "110 LaFrance Ave. - Attachment A" of the accompanying search warrant application (hereinafter "110 LaFrance Ave.").

(collectively "the Target Locations"). For the reasons set forth below, I submit that there is probable cause to believe that the Target Locations contain evidence of the above-described offenses.

6. I further submit this Affidavit in support of the issuance of a seizure warrant for one vehicle identified as follows:

a. a Green Infinity Q45 sedan, bearing vehicle identification number ("VIN") JNKNG01D8SM300236. The vehicle currently is assigned Massachusetts Registration number 3526LP and is registered to Carmen L. FIGUEROA, 90 Sandwich Road, Bourne, Massachusetts.

As detailed below, I have probable cause to believe that the [illegible] transport, [illegible] the [illegible], sale, receipt, possession [illegible] of controlled substances, in violation of 21 U.S.C. §§ [illegible] and [illegible], and therefore is property subject to seizure pursuant to 21 [illegible]

[illegible]

[illegible]

[illegible] personally known to me, or have been related to me by other federal, state, or local law enforcement officers or employees. The information contained in this Affidavit is submitted for the

sole purpose of supplying probable cause for the issuance of the requested complaint and warrants. Accordingly, this Affidavit does not contain all of the information known to me regarding this criminal investigation.

**Background of the Investigation**

8. In approximately December, 2002, as part of a homicide investigation, law enforcement officials listened to telephone calls made by an individual named Manuel Mendes ("Mendes"), who was incarcerated at the Plymouth House of Corrections ("PHOC"). MENDES is currently serving a term of eight to ten years, plus one day, arising out of a state conviction for trafficking between 28-100 grams of cocaine. While listening to these telephone calls, it appeared that MENDES continued to operate his cocaine business behind the prison walls. [illegible] [illegible] [illegible] the distribution of cocaine and maintenance of the drug proceeds.

9. [illegible]

[illegible] cellular telephone subscribed to and utilized by her; a T-Mobile cellular telephone also subscribed to and utilized by her; and a Nextel cellular telephone subscribed to and utilized by CUSTER.

Interceptions commenced on February 2, 2004, and ceased on March 2, 2004.

10. On March 4, 2004, the United States District Court (Lindsay, J) authorized the continued interception of wire communications on three of the four telephones that were initially authorized: FIGUEROA's residential telephone at 90 Sandwich Road; the T-Mobile cellular telephone also subscribed to and utilized by her; and a Nextel cellular telephone subscribed to and utilized by CUSTER. Interceptions of these three telephones commenced on March 4, 2004, and continue as of the date of this Affidavit.

11. During the course of both wiretaps, FIGUEROA had approximately 88 intercepted pertinent telephone conversations (as of March 10, 2004). Based upon the evidence obtained in this [illegible] MENDES [illegible] facilitates communications between MENDES and other members of his organization, including [illegible]

[illegible] Based [illegible] obtained in this investigation, it appears that CUSTER is an associate of Manuel Mendes, who is responsible for a number of different activities, including obtaining quantities of cocaine from the supplier in

New York and distributing narcotics to customers and collecting drug proceeds.

13. During the course of both wiretaps, ALVES had approximately 44 intercepted pertinent telephone conversations (as of March 10, 2004). Based upon the evidence obtained in this investigation, it appears that ALVES allows her residence to be used to process, package and store cocaine. It also appears that she collects and/or holds drug proceeds for Mendes and CUSTER.

14. During the course of both wiretaps, approximately 4 conversations were intercepted between the source of supply and FIGUEROA and the source of supply and CUSTER. On February 16, 2004, CUSTER spoke to the source of supply. The next day, on February 17, 2004, law enforcement observed TEJEDA meet with CUSTER in a [illegible] van in New York City (the nature of this meeting [illegible]). [illegible] during this investigation, it appears that TEJEDA is the source of supply for the organization, and that he [illegible]

ALVES and FIGUEROA TRANSPORT NARCOTICS TO 18 MURPHY ROAD

[illegible], 2004, at approximately [illegible] pm, [illegible] was intercepted talking to ALVES. CUSTER stated that he was not going to be at his house and instructed ALVES to "just come in the yard and open my truck". CUSTER then told ALVES to "put two

of them in the glove box." CUSTER ended the conversation stating he just had to run and do a couple of erraands and that he would come back to his house and "give that to him that way I won't miss this money." At 4:05 p.m., CUSTER was observed by law enforcement exiting 18 Murphy Road and driving away. Based upon my training, experience and knowledge of this investigation, I believe that when CUSTER referred to "two of them," that he was referring to a quantity of cocaine.

16. At approximately 4:10 p.m., law enforcement officials observed ALVES and FIGUEROA exit 299 Camp Street and enter an Infinity bearing Massachusetts registration number 3526 LP, FIGUEROA's vehicle. The vehicle was then observed by other law enforcement driving to 18 Murphy Road. When it arrived, the vehicle pulled into the driveway, and ALVES exited. She [illegible] [illegible] the passenger's [illegible] of the [illegible]. She then reentered the Infiniti, which then departed.

BREAK-IN AT FIGUEROA'S HOUSE ON FEBRUARY 15, 2004

[illegible] [illegible] safe and it had been stolen. At approximately 6:38 p.m., FIGUEROA and Mendes discussed the "real" amount that was taken from the safe, which FIGUEROA said was "6 and Jordan's 5,"

meaning $6,000 and possibly another $5,000 of Jordan's money (Jordan is Mendes' younger son). Later in the conversation, Mendes stated "thank God I moved that change." I believe this conversation meant that FIGUEROA maintained at least $6,000 at 90 Sandwich Road, Apt. 9, but that Mendes had already made arrangements to have the remainder of his money moved from FIGUEROA's apartment.

18. On February 17, 2004, in another conversation between MENDES and FIGUEROA, Mendes asked FIGUEROA at least twice whether she got something from under the sink. They also discussed a "key," which could have meant either a kilogram of cocaine or a key, that ALVES had. FIGUEROA told MENDES that she did not have it in a safe place.

CUSTER AND PAVAO's MEETINGS WITH TEJEDA IN NEW YORK

[illegible] [illegible] MENDES, FIGUEROA and CUSTER, it was learned that CUSTER [illegible]

[illegible] in Hyannis, Massachusetts, showed that CUSTER's mother rented a rental vehicle on December 3, 2003 and returned it on December 5, 2003; on December 17, 2003 and returned it on December 19, 2003;

December 30, 2003 and returned it January 1, 2004. The mileage accumulated during these rental periods was 636, 658 and 596 miles, respectively.

20. Recorded telephone calls from the PHOC during the period between December 3 and 5, 2003 indicated that CUSTER made a trip to New York to obtain a supply of cocaine. Likewise, recorded calls from the PHOC on December 30 and 31, 2003 between Mendes and FIGUEROA, ALVES and CUSTER indicated CUSTER had made another trip for the same purpose. For example, in a recorded PHOC call on December 30, 2003, Mendes had a conversation with ALVES. At one point during the conversation, ALVES was overheard speaking to CUSTER on the direct connect feature of a telephone. CUSTER told ALVES and Mendes that he had "4250" at the house. ALVES asked Mendes how much she was supposed to have, [illegible] and [illegible]. [illegible] the same conversation, Mendes told ALVES that "if dude [meaning the source of supply] call, tell him he's [illegible]." [illegible]

[illegible] training, experience and familiarity with this investigation, that CUSTER had in his possession $4,250 of drug proceeds, and ALVES had $8,500, and that MENDES instructed ALVES to use those

proceeds to purchase additional cocaine. I further believe, based upon my training, experience and familiarity with this investigation, that MENDES directed ALVES to tell the source, if he called, that CUSTER was going to pick up one-half kilogram of cocaine (approximately 500 grams), and that the cost would be approximately $12,500.

**CUSTER's TRIP TO NEW YORK CITY ON JANUARY 22, 2004**

21. In January, 2004, we installed a global positioning system ("GPS") in a rental car at the Avis company. On January 22, 2004, June Bettencort, whom I know to be CUSTER's mother, rented that vehicle and proceeded to drive it from Avis to her and CUSTER's home at 18 Murphy Road. Approximately one-half hour after her return from Avis, the rental vehicle was observed being driven from 18 Murphy Road to 153 Bacon Road, Hyannis, [illegible] CUSTER's girlfriend. The rental vehicle was being followed by another vehicle driven by Pavao. Approximately [illegible] in Rhode Island. The GPS malfunctioned again when the rental vehicle was heading southbound in Southern Connecticut; the next time the GPS functioned (for a brief period), the vehicle was heading

northbound in Connecticut. After the GPS was downloaded, the information showed that the rental vehicle had traveled to New York, and stopped for approximately 20 minutes on Boston Road, between E. 168th Street and E. 169th Street in the Bronx, which is the block of Boston Road where TEJEDA is believed to reside. The GPS showed that, upon returning to the Cape, the rental vehicle went from New York directly to the section of Camp Street in which 299 Camp Street, ALVES' residence, is located.

**CUSTER'S AND PAVAO'S TRIP TO NEW YORK CITY ON FEBRUARY 17, 2004**

22. On February 16, 2004, at approximately 8:07 p.m., FIGUEROA had a conversation with a male whom we believed to be TEJEDA. During this conversation, FIGUEROA stated that "Manny wants to send Chris out there tomorrow." FIGUEROA then indicated that M[illegible] was on the other line. FIGUEROA stated that "He's [illegible]." [illegible] [CUSTER] to be early." The two then appeared to discuss whether the price of the cocaine was [illegible]

[illegible] "[illegible]").

23. On February 17, 2004, surveillance agents traveled to the Bronx, New York early in the morning. Based on the GPS

information gathered following the January 22, 2004 trip, surveillance agents went to the Boston Road area in advance of the transaction. Other surveillance agents followed CUSTER from 18 Murphy Road to New York City. Surveillance agents observed CUSTER and Pavao driving a white Oldsmobile Alero, Massachusetts registration 35RM01, which was the rental vehicle from Avis in which we installed a GPS.

24. After CUSTER left 18 Murphy Road, surveillance agents watched CUSTER and Pavao drive to 299 Camp Street. Based on my knowledge of the investigation, I believed that CUSTER and Pavao were picking up money from ALVES for the trip to New York City and the drug transaction with TEJEDA. Surveillance agents then followed them to New York City.

25. At approximately [illegible] p.m., surveillance agent Brian [illegible] [illegible], pull up to TEJEDA's residence and park behind a red van which was known to be utilized by TEJEDA.[4] Special Agent Edwin [illegible]

---

[4] [illegible] The driver showed a New York State driver's license with the name and photograph of WILLIAM TEJEDA, number 792479262, 1234 Boston Road, Bronx New York. Special Agent Edwin Briganti reviewed the driver's license photograph after observing the February 17, 2004, meeting with CUSTER and the source of supply, and positively identified the person with whom CUSTER met as WILLIAM TEJEDA.

driver's license, and walk to the van. Agents observed CUSTER exit the Alero and enter the red van with TEJEDA and an unidentified male. Shortly thereafter, CUSTER exited the van and returned to the Alero carrying a black bag. Based on my experience and training and knowledge of this investigation, including the telephone call on February 16, 2004, referenced in paragraph 22, above, I believe that the black bag contained the cocaine from TEJEDA. I believe that the amount of cocaine was 570 grams based upon the February 16, 2004 call described above with FIGUEROA.

26. Immediately after returning to the Cape from New York City, CUSTER and Pavao proceeded directly to ALVES' residence at 299 Camp Street. CUSTER was observed carrying a package into the house.

[illegible] [illegible] ALVES' and [illegible]. The sum and substance of the calls early in the day pertained to CUSTER [illegible]

[illegible] CUSTER [illegible] ALVES' [illegible], and [illegible] responded that CUSTER "jetted back quick," meaning that CUSTER returned from New York in good time. CUSTER responded that he had things to do. Earlier that afternoon and evening,

CUSTER had telephone conversation with several individuals, including Ed White and Abena Sumpter, in which he made arrangements to conduct narcotics transactions. For example, at 3:02 p.m., CUSTER had a conversation with an unknown male in which the UM stated he needed "two," which I believe to be a reference to cocaine. When CUSTER spoke to Abena Sumpter, who has been identified as one of CUSTER's customers, at approximately 4:05 p.m., he told her he was not in town and would be back at approximately 8:00 p.m. When CUSTER spoke to Ed White, another known customer of his, at approximately 6:50 p.m., he told WHITE he would be home in approximately one hour. Based on these telephone calls, I believe that when CUSTER told Mendes he had things to do, he was referring to possible cocaine transactions with his customers.

[illegible] [illegible] individual[illegible] currently identified as CHRISTOPHER T. CUSTER, CARMEN FIGUEROA, DESIREE ALVES, and WILLIAM TEJEDA [illegible]

[illegible] United States Code, Sections 846 and 841(a)(1).

SEARCH WARRANTS

29. Based on information contained in this Affidavit, there

is also probable cause to believe that evidence defined in **Attachment B** for each Target Location, and relating to the illegal distribution of cocaine in violation of 21 U.S.C. §§841(a)(1) and 846, may be found at the Target Locations.

30. I believe that inculpatory evidence of drug activities may be found at the different Target Locations based on the evidence set forth this in affidavit. Moreover, in view of my experience as an experienced narcotics investigator, a search of these Target Locations will, likely, produce inculpatory evidence of drug distribution activities as well as quantities of cocaine, drug packaging materials, and U.S. currency earned through their illegal drug distribution efforts. In addition, discovery of wireless telephones known to be utilized by CUSTER, ALVES and FIGUEROA during this investigation, including specific target [illegible] [illegible] distribution, identification documents, telephone books, [illegible] [illegible] [illegible] [illegible] organization's drug distribution activities, records relating to the purchase and sale or ownership of vehicles utilized by these individuals in carrying out their drug activities, records

evidencing the expenditure of funds obtained from drug trafficking, including bills and receipts reflecting purchases, and other documents representing illegally earned proceeds obtained from drug trafficking, including bank account records, bank books, checks, bank drafts, and other financial account information, as well as other items detailed in **Attachment B**, may also be found at Target Locations.

31. I expect to find such items at the Target Locations because, in my experience, it is the practice of drug dealers and their close associates to maintain quantities of drugs, drug paraphernalia, U.S. currency, and financial records, ledgers, and other writings evidencing their illegal drug trafficking activities in safe, secure, and private places and locations like their homes, apartments, businesses, offices, and other leased or [illegible].

32. Record keeping, in particular, is critical to drug dealers in order to keep close track of monies paid and monies [illegible]

[illegible] their homes, residences, places of business or employment, or, perhaps, at some other location where that person has either an ownership or leasehold interest. Drug traffickers, especially

those that purchase drugs on consignment, also commonly keep "pay and owe" and other day-to-day financial records that reflect balances due (suppliers) for drugs purchased, and payments expected (customers) at these same locations. Such records can, frankly, only assist the drug distributor if they are accessible to him/her at the types of locations defined above.

33. In addition, based upon my training and experience, I know that narcotics traffickers sometimes conceal their drugs, drug paraphernalia, currency, records, and other items at locations other than their residences, or locations appurtenant to their residences, and sometimes use multiple stash houses to store these items. When narcotics traffickers store these items elsewhere, such as in storage areas appurtenant to an apartment or condominium unit, safe deposit boxes, units at commercial [illegible] [illegible] dominion and [illegible], they [illegible] maintain evidence of their dominion and control of the other location at their residences. [illegible] [illegible] [illegible] locations.

18 MURPHY ROAD, HYANNIS, MASSACHUSETTS

34. Based upon the investigation to date, there is probable

cause to believe that CUSTER resides at 18 Murphy Road with his mother and sister. Records from the Registry of Motor Vehicles indicate that CUSTER uses an address of 18 Murphy Road, Hyannis, Massachusetts. Surveillance has observed CUSTER entering and exiting the premises on countless occasions, including a time (as more fully described in the next paragraph) when CUSTER was intercepted and confirmed he was at the "crib," which I know is a slang term to mean someone's home. In addition, as set forth in paragraph 16, above, on February 14, 2004, ALVES and FIGUEROA traveled to CUSTER's home, as directed by him, and went directly to 18 Murphy Road. As set forth in paragraphs 29 through 33, because 18 Murphy Road appears to be the residence of CUSTER, an active narcotics trafficker involved in an ongoing criminal conspiracy with a number of other individuals, there is probable [illegible] [illegible] narcotics [illegible] and the disposition of narcotics proceeds may be located inside the residence.

[illegible]

[illegible]

[illegible]

drugs at 18 Murphy Road as he was observed on several occasions departing his residence and proceeding directly to a suspected narcotics transaction. For example, on February 3, 2004, at approximately [illegible] p.m., Mendes and CUSTER had a conversation in which MENDES asked CUSTER whether he was going out or staying at

the "crib," which I believe to be a slang word for "home." During this call, CUSTER was observed by surveillance agents to be at 18 Murphy Road. During the call, Mendes asked CUSTER if he had "two" over there, and asked if he [CUSTER] "finished that one too?" CUSTER responded that he was working on them. Based upon my training, experience and familiarity with this investigation, I believe that the "two" to which Mendes referred was a reference to a quantity of cocaine that CUSTER was attempting to sell.

36. Further, on February 20, 2004, at approximately 1:34 p.m., law enforcement intercepted a telephone call from an unknown male ("UM") to CUSTER. The UM was using a telephone assigned the number (508) 367-2701, subscribed to Peter Sisson at 11 Captain Studley Road, Marston Mills, Massachusetts. During the call, the UM asked CUSTER how long it would take to get out [illegible] [illegible] would be there shortly.

37. At approximately [illegible] p.m., [illegible]

[illegible] [illegible] Road, Marstons Mills, MA. At approximately [illegible] p.m., CUSTER contacted the same UM referenced above. The UM told CUSTER he had $175, and CUSTER told the UM to come outside. At approximately 3:36 p.m., CUSTER is observed turning onto Whites Lane, which is a small dead end street. Approximately five minutes later, CUSTER was observed driving out of Whites

Lane.

38. On February 24, 2004, at approximately 7:31 p.m., CUSTER received a telephone call from Abena Sumpter ("Sumpter"), who was using a telephone assigned the number (508) 420-5516. In summary, she asked if CUSTER would do something for "35," and CUSTER said she would have to wait until he got a ride. Sumpter said she would call back at around 9:00 p.m. At approximately 9:47 that evening, she spoke to CUSTER again, and the two agreed to meet at "the hotel." At approximately 9:48 p.m., law enforcement observed CUSTER leave 18 Murphy Road in an Isuzu Trooper. He was followed directly to the Heritage House Hotel on Main Street, Hyannis, Massachusetts, which I know to be adjacent to Sumpter's residence. CUSTER pulled into the lot at approximately 9:55 p.m., and, one minute later, he was observed [illegible] [illegible] directly back to 18 Murphy Road.

39. Based upon my training, experience and knowledge of [illegible]

[illegible]

[illegible] Murphy Road and returned to 18 Murphy Road directly after the transactions. I believe that this pattern of activity suggests that 18 Murphy Road is used by this narcotics trafficking organization to store drugs and drug proceeds. Further, because CUSTER has direct and daily contact with narcotics customers and

associates, there are likely to be documents and other items located at the residence which demonstrate his relationship with these individuals and with these items.

40. Based upon the foregoing, and based upon my training and experience, there is probable cause to believe that the premises at 18 Murphy Road, Hyannis, Massachusetts, presently contain the items set forth in "18 Murphy Road - Attachment B," which contain evidence of a commission of a criminal offense, contraband, the fruits of crime, things otherwise criminally possessed, and property designed or intended for use or which is or has been used as a means of committing a criminal offense, specifically, violations of Title 21, United States Code, Sections 846 and 841(a)(1).

299 Camp Street, West Yarmouth, Massachusetts

[illegible] Camp Street, West Yarmouth, Massachusetts, with her children. Telephone records indicates [illegible]

[illegible] Camp Street, West Yarmouth, Massachusetts. The contents of intercepted telephone calls have suggested that ALVES resides there. As set forth on paragraphs 29 through 33, because 299 Camp Street appears to be the residence of ALVES, an active narcotics trafficker involved in an ongoing criminal conspiracy

with a number of other individuals, there is probable cause to believe that certain documents and other evidence related to narcotics trafficking and the disposition of narcotics proceeds may be located inside the residence.

42. In addition to that being ALVES' residence, other information obtained during the investigation suggests that 299 Camp Street may contain evidence related to the narcotics trafficking conspiracy. On January 22, 2004, after returning to the Cape from New York, CUSTER drove directly to the area on Camp Street where 299 is located. Also, on February 17, 2004, CUSTER and Pavao stopped at 299 Camp Street immediately before getting on the highway to New York, and, after returning to the Cape from New York, they went directly to 299 Camp Street. Further, as mentioned in paragraph 16, above, ALVES delivered a quantity of [illegible]

43. In addition, the following intercepted telephone calls [illegible]

[illegible] with [illegible] asked ALVES, "what did you get me," and ALVES responded "980." ALVES then proceeded to tell FIGUEROA that when Chris, meaning CUSTER, gave her the money, he was "twenty dollars short," and, after a brief discussion about how CUSTER was "smoking," said that she told him

[CUSTER] when he was "handling Manny's money," meaning Mendes, that he should not be high. FIGUEROA agreed and told ALVES to "do something because he can't be f*** up" and that he was going to "be cut off pretty soon if he keeps doing that." During this call, it appears that CUSTER turned over $980 of drug proceeds to ALVES, who then intended to give it to FIGUEROA. It also appeared that both ALVES and FIGUEROA considered that the drug proceeds belonged, at least in part, to MENDES.

b. On February 9, 2004, Mendes and FIGUEROA had a conversation, in which Mendes told FIGUEROA that if he, meaning CUSTER, left something with "her," referring to ALVES, FIGUEROA should "just grab it."

c. [illegible], 2004, [illegible] [illegible], in which the two [illegible] box, which contained some items. FIGUEROA stated that she was [illegible]

[illegible] FIGUEROA [illegible] box [illegible] "[illegible]," [illegible] Spanish word [illegible], [illegible] [illegible] responded affirmatively. Mendes eventually told FIGUEROA to take the box to Des', meaning ALVES. Surveillance then observed FIGUEROA driving to 110 LaFrance Avenue, where Mendes' mother and children reside, and picking up some children. After a stop at

McDonald's, FIGUEROA drove to 299 Camp Street and entered the residence carrying an object.

Based upon my training, experience and knowledge of this investigation, I believe that this pattern of activity suggests that 299 Camp Street is used by this narcotics trafficking organization to store drugs and drug proceeds. Because ALVES appears to work closely with FIGUEROA and CUSTER, and stores these items at her house, there are likely to be documents and other items located at the residence which demonstrate her relationship with these individuals and with these items.

44. Based upon the foregoing, and based upon my training and experience, there is probable cause to believe that the premises at 299 Camp Street, West Yarmouth, Massachusetts, presently contain the items set forth in "299 Camp Street – [illegible]," [illegible] [illegible], contraband, the fruits of crime, things otherwise criminally possessed, and property designed or intended for use [illegible] which is or has been used [illegible] [illegible] [illegible].

90 SANDWICH ROAD

45. There is probable cause to believe that FIGUEROA resides at 90 Sandwich Road, Apt. 9, Bourne, Massachusetts. Telephone records indicate that her residential line and a Nextel telephone are subscribed to FIGUEROA's name at 90 Sandwich Road, Apt. [illegible], Bourne, MA. Records from T-Mobile indicate that

another cellular telephone is registered to her name at 90 Sandwich Road, Apt. 9-C, Buzzards Bay, Massachusetts. On February 15, 2004, FIGUEROA reported to the Bourne Police Department that her residence at 90 Sandwich Road, Apt. 9D, Bourne, Massachusetts had been broken into, and the reporting detective entered FIGUEROA's apartment which had the numeral "9" on the door. However, a telephone conversation intercepted on March 8, 2004, indicated that FIGUEROA intends to change her residence in the near future and I have learned that her children have already changed schools. Nonetheless, as of the date of this Affidavit, FIGUEROA continues to maintain her residence at 90 Sandwich Road, Apt. 9. As set forth on paragraphs 29 through 33, because 90 Sandwich Road, Apt. 9, appears to be the residence of FIGUEROA, an active narcotics trafficker involved in an [illegible] [illegible] other evidence related to narcotics trafficking and the [illegible]

[illegible] [illegible] the narcotics trafficking conspiracy. As set forth above, on February 15, 2004, FIGUEROA reported to the local police that $600 was stolen from her home, yet the intercepted calls on that day indicated that the sum stolen was much greater. Likewise, numerous other telephone conversations suggest that

drug proceeds are delivered to her and then stored at her residence. The ongoing nature of these telephone calls suggest that this is a continuous practice of these coconspirators. For example,

a. on September 9, 2003, Mendes and FIGUEROA had several conversations in preparation for a trip to New York that CUSTER intended to make the next day. Mendes told FIGUEROA that they needed to "pick extra shit up," which I believe to be a reference to obtaining additional quantities of cocaine. After a brief discussion between Mendes and FIGUEROA regarding the numbers - 4, 10, seven plus seven, 14 - FIGUEROA stated that "I'm talking about in the thing, I'm not talking about the other shit." She further explained that "in [illegible] in the thing, what's in there," to which MENDES responded "14." Based upon my training, experience and [illegible]

[illegible] which are maintained by FIGUEROA at her residence. After further discussion, MENDES stated that "listen to me, in that thing is 14 right, so [illegible] need [illegible] plus [illegible], 24 plus 1[illegible] equals 36 altogether." Based upon my training, experience and knowledge of this investigation, I

believe that MENDES told FIGUEROA that they needed to obtain a kilogram and a half of cocaine, at a total purchase price of $36,000 ($24,000 per kilogram)., c

b. On February 9, 2004, at approximately 6:55 p.m., Mendes spoke to FIGUEROA, who was using her residential land line. Mendes asked FIGUEROA "did you get that money from her?" FIGUEROA reported that "She gave me, um, nine, and I have eight-fifty left...why was it only nine and it wasn't one?". MENDES answered "Cause Chris only gave her nine. Didn't she tell you?" I believe this conversation references CUSTER giving ALVES nine hundred dollars and MENDES inquiry as to whether FIGUEROA received this $900 from ALVES, presumably from the sale of cocaine. Then in another conversation [illegible] asked FIGUEROA if she did what he told her, and FIGUEROA responded "I'm not gonna forget, you said put [illegible]

[illegible]

47. Based upon the foregoing, and based upon my training and experience, there is probable cause to believe that the premises at 90 Sandwich Road, Apt. 9, Bourne,, Massachusetts, presently contain the items set forth in "90 Sandwich Road, Apt. 9 - Attachment B," which contain evidence of a commission of a

criminal offense, contraband, the fruits of crime, things otherwise criminally possessed, and property designed or intended for use or which is or has been used as a means of committing a criminal offense, specifically, violations of Title 21, United States Code. Sections 846 and 841(a)(1).

**110 LAFRANCE AVENUE**

48. 110 Lafrance Ave is the residence of Mendes' mother (Tyianne), brother (Andy) and at least one of his children (Jordan). CUSTER is observed at this residence on a daily basis. Based upon the investigation to date, there is probable cause to believe that 110 LaFrance Ave, Hyannis, Massachusetts may contain evidence related to narcotics trafficking. Evidence suggests that CUSTER and Mendes may be storing quantities of drugs and/or U.S. currency at this residence as he (CUSTER) has been observed, [illegible] proceeding directly to a suspected narcotics transaction.

49. For example, on February 10, 2004, at approximately [illegible] surveillance officers observed CUSTER depart 110 LaFrance Ave and travel directly to the Frisbee golf course to meet with White. This meeting was observed by law enforcement officers and occurred in CUSTER's vehicle. Following the meeting, surveillance officers followed CUSTER directly back to 110

Lafrance Ave.

50. Further, on February 13, 2004, at approximately 3:33 p.m. and 8:50 p.m., CUSTER received two phone calls from Ed White. During the first call, White asked CUSTER for a "hundred". During the second call, White inquired when CUSTER will be at White's location. At approximately 9:26 p.m., surveillance observed CUSTER and PAVAO exit 110 LaFrance Ave and enter the Isuzu Trooper (MA reg 1841JV). A moving surveillance followed CUSTER and Pavao directly to Whites Lane in Marstons Mills, MA. Approximately one minute after pulling down Whites Lane, surveillance observed the Trooper exit same and drive from the area.

51. On February 28, 2004, at approximately 1:00 p.m. and 2:30 p.m., law enforcement intercepted two phone calls between [illegible] [illegible] and CUSTER, [illegible] to be expressing a concern of Mendes regarding a situation involving the children at 110 [illegible]

[illegible]

[illegible] with uhm . . . where that's at, there's a lock on it and nobody can even get into it." During the second call, Mendes spoke directly with CUSTER and instructed CUSTER to get out of the mall "so you can take care of that man because, I'm fucking, kids are out there." CUSTER acknowledged and Mendes said "I want

to make sure the m****f****, they can't, they can't get to it anyway, right." CUSTER replied, "nah, its got a lock" and "I got the only key." There is a shed located to the rear of 110 Lafrance Ave.

52. Moreover, on February 3, 2004, at approximately 9:16 p.m., law enforcement intercepted a phone call from an unknown male ("UM") believed to be residing at 1927 Falmouth Rd, Centerville, MA, to CUSTER during which the UM advised CUSTER that he has some "change" for him. CUSTER advised the UM that he would be by in twenty minutes. Consequently, surveillance was initiated at the above address. At approximately 9:45 p.m., surveillance observed a white Cadillac (MA reg. 62EA08) routinely operated by CUSTER pull into 1927 Falmouth Rd. Approximately three minutes later, surveillance observed the Cadillac exit the [illegible] LaFrance Ave. [illegible] the Cadillac were identified as CUSTER and [illegible].

53. Moreover, as mentioned in paragraph 43(c), above, on March [illegible], 2004, [illegible]

[illegible]

[illegible] said no. As I stated in paragraph 43(c), they eventually agreed to bring it to Des' (299 Camp Street). On April 21, 2000, I executed a state search warrant at 110 LaFrance in relation to the case in which Mendes is currently imprisoned. I found approximately $80,000 in U.S currency hidden in the attic.

54. Based upon my training, experience and knowledge of this investigation, I believe that on February 10 and 13, 2004, CUSTER made arrangements to meet with White to conduct drug transactions. In both of these transactions, CUSTER proceeded directly from 110 LaFrance Ave to the meet locations. I also believe that the carefully worded conversations involving the whereabouts of "that" (referenced in paragraph 51) indicate the presence of cocaine and/or US currency in the locked shed at 110 Lafrance Ave. I believe that on March 4, 2004, CUSTER picked up U.S. currency related to a drug transaction from the unknown male at 1927 Falmouth Rd and proceeded directly to 110 LaFrance Ave. with said money. I believe that this pattern of activity suggests that 110 LaFrance Ave. is used by this narcotics trafficking organization to store drugs and drug proceeds. Further, [illegible] has [illegible] and daily [illegible] with [illegible] customers and associates, there are likely to be documents and other items located at the residence which [illegible] with [illegible]

SEIZURE WARRANT

[illegible] discussed above, on February [illegible], [illegible], [illegible] and ALVES used the Infiniti to transport narcotics from ALVES' residence at 299 Camp Street to CUSTER's residence at 18 Murphy Road. Accordingly, there is probable cause to believe that the green Infiniti Q45 sedan, bearing vehicle identification number ("VIN") JNKNG01D8SM300236, currently assigned Massachusetts

Registration number 3526LP and registered in the name of Carmen L. FIGUEROA, 90 Sandwich Road, Bourne, Massachusetts, constitutes property used or intended to be used to transport, or to facilitate the transportation, sale, receipt, possession or concealment of controlled substances, in violation of 21 U.S.C. Sections 846 and 841, and that the property is subject to seizure and forfeiture pursuant to 21 U.S.C. Sections 853 and 881.

Signed under the pains and penalties of perjury this 16 day of March, 2004.

SEAN E. BALCOM
Special Agent
Drug Enforcement Administration

Sworn to and subscribed before me this 16th Day of March, 2004.

JUDITH GAIL DEIN
United States Magistrate Judge