UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Crim. No. 04-10098-WGY |
| | ) | |
| CHRISTOPHER CUSTER, | ) | |
| | ) | |
| Defendant | ) | |

**SENTENCING MEMORANDUM**
**ON BEHALF OF CHRISTOPHER CUSTER**

Christopher Custer comes before this Honorable Court having pled guilty to conspiracy to trafficking in over fifty grams of cocaine base. He began serving his sentence when he pled guilty on May 6, 2005, at the age of 28.[1] He turned 29 in prison one month ago. At issue in the sentencing phase of this case is whether the young man now before this Court will be 38, in his late 40s, or in his late 50s when he is eventually released from federal prison.

In fashioning a sentence, 18 U.S.C. § 3553 directs the court to "impose a sentence sufficient, but not greater than necessary," to carry out the purposes of criminal sentencing set forth in subsection 3553(a)(2): punishment, deterrence, incapacitation, and rehabilitation. While the sentencing guidelines are an "important consideration in sentencing," they do not have "controlling" weight. United States v. Jimenez-Beltre, No. 05-1268, slip op. at 4, 6 (March 9, 2006). The "central principle" to which the court must

---

[1] He was also incarcerated for over a month between his arrest on March 16 and his release on bail on April 22, 2004.

refer is that the sentence must be "sufficient, but not greater than necessary." Id. at 16 (Torruella, J., concurring).

As described below, Mr. Custer's sentencing presents a number of factors that, while not arising to the level of "departures" under the Guidelines, nonetheless warrant this Court's serious consideration under the Sentencing Reform Act, as modified by United States v. Booker, 125 S. Ct. 738 (2005). Specifically, Mr. Custer respectfully submits that in light of traumatic events in his youth and childhood, their lasting effect on his mental health, his commendable post-arrest conduct – including testifying for the Commonwealth in a successful first-degree murder prosecution – and the nature of his crime, a ten-year sentence, below the guidelines range and providing for his release at age 38 while he still has some prospect of a productive life, will best serve the goals of sentencing, and that any longer term would be "greater than necessary" to do so.

I.    STATUTORY PROVISIONS AND ADVISORY GUIDELINE RANGE.

The statutory sentencing range for Mr. Custer's criminal conduct is "a term of imprisonment which may not be less than 10 years or more than life." 21 U.S.C. § 841(b)(1)(A).

A.    Base Offense Level

The Presentence Report ("PSR") calculates the advisory guidelines range as follows. The applicable Offense Level is specified in the Drug Quantity Table, U.S.S.G. §§ 2D1.1(a)(3), 2D1.1(c). PSR ¶ 83. The Probation Office calculates that Mr. Custer is responsible for 5.718 kilograms of cocaine base. PSR ¶¶ 84-95. The Base Offense Level for 1.5 kilograms or more of cocaine base is 38. Id. ¶ 95 (citing U.S.S.G. § 2D1.1(c)(1)). The PSR further concludes that none of the Specific Offense Characteristics in § 2D1.1(b) are applicable, and that no other upward adjustment is warranted, PSR ¶¶ 96-

99, so that the Offense Level remains at 38, id. ¶ 100. Mr. Custer is entitled to a 3-level reduction of responsibility, id. ¶ 101. His Offense Level under the Guidelines is, therefore, 35.

The PSR concludes Mr. Custer has 8 criminal history points, placing him in Criminal History Category IV. PSR ¶¶ 114-15. One criminal history point is attributable to a charge of negligent operation of a motor vehicle when he was eighteen years old, which was continued without a finding from March 7, 1997, to March 6, 1998, and then dismissed. PSR ¶ 108. Mr. Custer notes that but for Massachusetts's idiosyncratic classification of offenses, which classifies this charge as a misdemeanor, as it does all charges punishable by up to two and one half years in the house of correction, this offense would not be counted under U.S.S.G. § 4A1.2(c)(1) & Application Note 3. Accordingly, Mr. Custer contends that 8 criminal history points overstates the severity of his record. Nonetheless, even with 7 criminal history points, he would be in Criminal History Category IV. The applicable advisory guidelines range for Offense Level 35 at Criminal History Category IV is 235 to 293 months. Id. ¶ 169.

B.     Role in the Offense

The Probation Office correctly concluded, over the Government's objection, that an adjustment for Mr. Custer's role in the offense is unwarranted. PSR ¶ 97 & p. 44. The Government contends that Mr. Custer should be given a 3-level adjustment for being a "manager or supervisor" of a criminal activity involving "five or more participants," U.S.S.G. § 3B1.1(b), because out of all the participants in the conspiracy, Mr. Custer was allegedly the "manager or supervisor" of his girlfriend, co-defendant Jennifer Pavao. The Court should accept the PSR's recommendation.

The Government, of course, "must bear the burden of proving that an upward role-in-the-offense adjustment is warranted." United States v. DiSanto, 86 F.3d 1238, 1259 (1st Cir. 1996). Moreover, to ensure that the defendant's sentence is consonant with due process of law, to the extent a sentencing enhancement raises the advisory guidelines range, this Court must make such findings beyond a reasonable doubt. See Booker, 125 S. Ct. at 798 n.6 (Thomas, J., dissenting) ("The Fifth Amendment requires proof beyond a reasonable doubt, not by a preponderance of the evidence, of any fact that increases the sentence beyond what could have been lawfully imposed on the basis of facts found by the jury or admitted by the defendant."); United States v. Malouf, 377 F. Supp. 2d 315, 328-29 (D. Mass. 2005). See also Tr. 6 May 2005 at 31 (this Court opining, at Mr. Custer's guilty plea colloquy, that "I think constitutionally the standard should be beyond a reasonable doubt"). Cf. United States v. Gray, 362 F. Supp. 2d 714, 723 (S.D. W.Va. 2005) (in determining how much weight to assign advisory guideline range, court will consider what the range would have been if based solely on conduct proven beyond a reasonable doubt).

As an initial matter, Jennifer Pavao was not a "participant" in criminal activity that "involved five or more participants." U.S.S.G. § 3B1.1(b) & Application Note 1. Ms. Pavao's guilty plea was based solely on the amounts of cocaine base that Mr. Custer distributed in her presence.[2] She had absolutely no involvement with Tejeda, Mendes, Figueroa, Alves, or Eldridge. Thus, even if Mr. Custer could be considered a manager or supervisor, the criminal activity involved only himself and Mr. Pavao.

---

[2] At her guilty plea colloquy, Pavao admitted that she knew, when she accompanied Mr. Custer on his rounds on the Cape, that he was selling drugs to customers. She did not admit that she knew the purpose of the trips to New York. See Tr. 29 April 2005 at 43-45 (change of plea hearing of Pavao and Mendes).

4

Factors to be considered in determining whether a defendant exercised a managerial role include "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." DiSanto, 86 F.3d at 1259 (quoting U.S.S.G. § 3B1.1, Application Note 4).

In this regard, it is not sufficient to show that the defendant "determined who purchased, when and where sales took place, prices, and profit." United States v. Castellone, 985 F.2d 21, 26 (1st Cir. 1993). "[T]he same can be said of any independent, street-level dealer. In fact, no street-level drug sale could ever be made without a customer, a time and location for the sale, and a price." Id. "Instead, the defendant must have exercised some degree of control over others involved in the commission of the offense or he must have been responsible for organizing others for the purpose of carrying out the crime." United States v. Fuller, 897 F.2d 1217, 1220 (1st Cir. 1990).

The involvement of Jennifer Pavao does not warrant the conclusion that Mr. Custer recruited or exercised control over her. Mr. Custer anticipates that, if called as a witness, Ms. Pavao will testify that although she knowingly accompanied Mr. Custer during some of his street-level deliveries and sales of drugs, her involvement not as Mr. Custer's subordinate in the drug conspiracy. She did not carry out any sales on his behalf, but rather stayed in the car while he went about his business. She accompanied Mr. Custer as his girlfriend, because she wanted to be with during his evening activities. See United States v. McGregor, 11 F.3d 1133, 1139 (2d Cir. 1993) (error of law to impose role-in-the-offense enhancement where "the defendant simply asked his wife to

hand over packages to some men who might arrive at their home while he was away"). A 3-level role-in-the-offense adjustment for Mr. Custer's relationship with Pavao is unwarranted.

Finally, even if the Court were to find that the Government proved that Mr. Custer managed or supervised Ms. Pavao, Mr. Custer is still entitled to a 3-level reduction for acceptance of responsibility. U.S.S.G. § 3E1.1. At Mr. Custer's plea colloquy, the Court indicated that if Mr. Custer put the Government to the time and expense of proving their alleged adjustments, Mr. Custer's acceptance of responsibility reduction would be "in play." Tr. 6 May 2005 at 23-27. Such a penalty is not appropriate here, for at least three reasons. First, the recommendation in the PSR requires the Government to expend the "time and money" to call Ms. Pavao as a witness if it wishes to prove this enhancement. Second, the Government would likely have put her on the stand anyway to justify its anticipated motion for a substantial assistance departure on Ms. Pavao's behalf. Third, Mr. Custer's opposition to the adjustment is not "frivolous." U.S.S.G. § 3E1.1, Application Note 1(a).

II.    FACTORS SUPPORTING A NON-GUIDELINES SENTENCE.

The "general approach" to sentencing post-Booker, as outlined by the First Circuit, is (1) determination of the guideline range, (2) consideration of proposed departures, and (3) "the further determination whether other factors identified by either side warrant an ultimate sentence above or below the guideline range." Jiminez-Beltre, slip op. at 9. Mr. Custer does not suggest that he is eligible for any specific departure, but asks this Court to turn to the third step and consider certain factors, short of technical departures, that nonetheless warrant a sentence below the guideline range.

In fashioning a sentence "sufficient, but not greater than necessary," to carry out the purposes set forth in 18 U.S.C. § 3553(a)(2), the court must consider "the need for the sentence imposed – (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public for further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." Id. § 3353(a)(2).

As modified by United States v. Booker, which makes the Guidelines merely "advisory," the statute "requires a sentencing court to consider Guidelines ranges, see 18 U.S.C. § 3553(a)(4), but it permits the court to tailor the sentence in light of other statutory concerns as well, see § 3553(a)." Booker, 125 S. Ct. at 757 (emphasis added). Among these additional statutory concerns are "(1) the nature and circumstances of the offense and the history and characteristics of the defendant; . . . (3) the kinds of sentences available; . . . (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a).

A.    "History and Characteristics of the Defendant" - § 3553(a)(1)

While the Guidelines set out numerous factors that the district courts are either discouraged or prohibited from considering as grounds for a departure, see, e.g., U.S.S.G. § 5H1.1 (age of defendant); § 5H1.2 (education and vocational skills); § 5H1.3 (mental and emotional conditions); § 5H1.5 (employment record); § 5H1.6 (family ties and responsibilities); § 5H1.12 (lack of guidance as a youth, disadvantaged upbringing), Booker permits the Court to give such factors reasonable weight in its consideration of the "history and characteristics of the defendant." See United States v. McBride, 434

F.3d 470, 476 (6th Cir. 2006) ("many of the very factors that used to be grounds for a departure under the Guidelines are now considered by the district court -- with greater latitude -- under section 3553(a)"); United States v. Mickelson, 433 F.3d 1050, 1055 (8th Cir. 2006) ("In contrast to the sentencing scheme before Booker when a sentence outside the mandatory guideline range was permitted only on very limited grounds, there are now more sentencing variables.")

Accordingly, the First Circuit has remanded for resentencing under Booker several cases in which the district court considered itself unable to take into account characteristics of the defendant the fell short of warranting departures.  See, e.g., United States v. Walter, 434 F.3d 30, 41-42 (1st Cir. 2006) (remanding for resentencing where district judge believed he was without discretion under the Guidelines to consider that "defendant has had a difficult life in a number of ways, particularly being raised by his grandmother and aunt"); United States v. Heldeman, 402 F.3d 220, 224 (1st Cir. 2005) (remanding for consideration under Booker of defendant's "age and physical condition"); United States v. Bisanti, 414 F.3d 173-74 (1st Cir. 2005) (remanding for consideration of "diminished mental capacity and family circumstances"); United States v. Antonakopoulos, 399 F.3d 68, 83 (1st Cir. 2005) (remanding for consideration of "family circumstances," specifically, "the fact that [defendant's] son was brain damaged and he had been his son's caretaker").

1.    *Traumatic Events in Childhood and Early Adulthood.*

As documented in the PSR ¶¶ 128-31, 139, Mr. Custer's life has been marked by traumatic events.  Three stand out.  First, when he was nine years old, Mr. Custer witnessed his eighteen-year-old step-brother, Barry Bettencourt, being shot to death in an altercation with two Barnstable police officers in front of the family home.  As

documented in the attached newspaper reports, the "official version" of the story was that as the officers were trying to arrest him on a domestic violence complaint, Mr. Custer's brother grabbed one officer's gun and fatally shot himself in the chest. The officer was exonerated. This incident not only had a negative effect on Mr. Custer's view of authority in general and the police in particular, but it may have also left permanent psychic scars, as detailed below.

The next formative event in Mr. Custer's youth was the foreclosure upon and loss of the family home when he was seventeen. PSR ¶ 130. Copies of pleadings evidencing this demoralizing and life-altering event are attached. Mr. Custer and his family were left as transients, living either in campgrounds or with friends and family. This experience strained the relationship between Mr. Custer's parents, who ultimately divorced, and the overall lack of stability led directly to Mr. Custer's involvement in criminal activity. Indeed, a review of his criminal record confirms that age seventeen was a turning point in Mr. Custer's behavior.

The third significant event was the murder of Daniel Mendes, the brother of co-defendant Manuel Mendes, in December 2002. Daniel Mendes was Mr. Custer's good friend, and Mr. Custer was close with the children of Daniel Mendes and Desiree Alves. Daniel's death left Alves alone to support her children; Mr. Custer took it upon himself to help her.

2.    *Post-Offense Conduct – "Substantial Assistance"*

Particularly relevant to Mr. Custer's case, Booker now gives district courts the discretion to consider a defendant's cooperation with law enforcement, even where the Government has not filed a motion pursuant to U.S.S.G. § 5K1.1. See United States v. Lazenby, Nos. 05-2214, -2216, 2006 U.S. App. LEXIS 5960 at 15-16 (8th Cir. March 10,

2006) ("Prior to <u>Booker</u>, the court was then virtually precluded from considering this factor. Under <u>Booker</u>, the prosecution's evaluation of the cooperation factor remains critical but is less controlling. . . . Under the Sentencing Reform Act and <u>Booker</u>, sentencing discretion rests in the final analysis with the sentencing judge, not with the prosecution.") (citations omitted); <u>United States v. Murray</u>, No. 02 CR 1214 (HB), 2005 U.S. Dist. LEXIS 9649 at 9 (S.D.N.Y. May 20, 2005) (["defendant's] cooperation with the Government (while not in the Government's view sufficient to warrant a motion pursuant to 5K1.1 and thus warranting a departure) is now something that the Court may consider along with all the other factors in § 3553(a)").

As detailed in the affidavits of the Case Agent for this case, DEA Task Force Agent Sean E. Balcom, a Detective-Sergeant for the Barnstable Police Department, the discovery of co-defendant Mendes's drug distribution activity out of the Plymouth County was a by-product into the investigation of the murder of Mendes's brother Daniel Mendes. In November 2004, during the time that Mr. Custer was at liberty on bail with respect to the instant case, Det. Balcom personally served Mr. Custer with a subpoena to testify for the Commonwealth in the trial of Kevin D. Haliday for the murder of Daniel Mendes. As a result, Mr. Custer provided substantial assistance to the Commonwealth by testifying for the prosecution on November 9, 2004, helping to convict Haliday of first-degree murder. Copies of the subpoena served upon Mr. Custer (obtained from the Cape & Islands District Attorney's office, with no return executed), a letter from the prosecutor, First Assistant District Attorney Brian S. Glenny, the Superior Court's witness list, and an article from the Cape Cod Times are attached.

Significantly, although he knew or should have known that Mr. Custer was represented by counsel in this matter, Detective Balcom did not provide notice to Mr.

Custer's counsel that he was seeking Mr. Custer's cooperation in the murder prosecution, let alone ask permission to speak with Mr. Custer. Given the grudging interpretation of "offense" for the purposes of the Sixth Amendment right to counsel, see United States v. Coker, 433 F.3d 39, 41-45 (1st Cir. 2005), Mr. Custer cannot claim that he had the right to counsel with respect to the murder prosecution, or even that Det. Balcom's conduct, as an agent of the U.S. Attorney's office, gives rise to an ethical violation. Cf. Massachusetts Rules of Professional Conduct, Rule 4.2 ("In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so."). However, Det. Balcom's conduct effectively foreclosed any possibility of Mr. Custer obtaining any benefit with respect to the instant criminal charges. As argued below, this Court should take this significant conduct into account in its sentencing determination.

3.    *Post-Offense Conduct – Employment/Vocation*

Since his arrest, for a period of over one year while he was at liberty on bail, Mr. Custer was not involved in any illegal conduct. He did not partake in controlled substances. Indeed, he even assisted in law enforcement efforts, as discussed above.

Mr. Custer was arrested in connection with this case on March 16, 2004, and released on bail on April 22, 2004. From April 2004 through February 2005, Mr. Custer was self-employed, installing car stereos at his home, a self-taught skill. From February 23, 2005, until he was incarcerated following his guilty plea, Mr. Custer worked at a tree and landscaping service, which valued him as an employee, stating that he was "always on time," "had great ability and drive to do his job," and was "always reliable." PSR

¶ 155. As the PSR indicates, he hopes to receive vocational training in electronics or plumbing once he is assigned to a prison where such programs are available. Id. ¶ 152.

### 4.    *Mental Health Factors*

Dr. Ronald Ebert, a Harvard Medical School psychologist, interviewed Mr. Custer twice in prison and conducted the MCMI-III test. Dr. Ebert's "assessment, supported by testing is that [Mr. Custer] currently suffers from post-traumatic stress disorder, generalized anxiety disorder and psychoactive substance abuse." See Letter of Ronald S. Ebert, Ph.D., at 1 (March 24, 2006) (attached). In reaching this conclusion, Dr. Ebert notes as significant the facts that Mr. Custer witnessed the shooting of his brother and that Mr. Custer's family became homeless when he was seventeen. Dr. Ebert explains that Mr. Custer's unaddressed mental health issues both marginalized him and contributed to his "life of wandering and drug abuse." Dr. Ebert further suggests that Mr. Custer is a good candidate for rehabilitation through appropriate medication and counseling.

### B.    Sentencing Options and Disparities - §§ 3553(a)(3), (6)

The instant offense carries a minimum mandatory sentence of ten years – Congress's clearest indication of how much time is sufficient, but no greater than necessary, to reflect the seriousness of the crime – and Mr. Custer does not contend that he qualifies for any exception to the mandatory minimum.[4] The lowest sentence within

---

[4] However, Mr. Custer has argued, in a memorandum that is currently under advisement, that because his indictment did not specify that his crime involved 50 grams or more of "crack," as opposed to "cocaine base," this Court is required under Apprendi v. New Jersey, 530 U.S. 466 (2000), to sentence him within the applicable statutory provision for cocaine powder, which provides for a term of not more than twenty years, with no mandatory minimum, 21 U.S.C. § 841(b)(1)(C). See Memorandum of Law in Support of Sentencing Pursuant to Statutory and Guidelines Provisions for Cocaine Powder, filed December 16, 2005, which is incorporated herein by reference.

the advisory guidelines range, however, assuming Offense Level 35 and Criminal History Category IV, is 235 months, almost twenty years.  Under <u>Booker</u>, this Court is free to impose a ten-year sentence.

       1.    *Crack, Cocaine Base, and Powder Cocaine*

Whether Mr. Custer is responsible for 5.718 kilograms of crack, as the Probation Office concludes, PSR ¶ 95, or 14.5 kilograms, as the Government contends, PSR at p. 43, if the conspiracy had involved cocaine powder, the Base Offense Level would have been 32 instead of 38, the total Offense Level, 29 instead of 35, and the guidelines range, 121 to 151 months.

In <u>United States v. Pho</u>, 433 F.3d 53 (1st Cir. 2006), the First Circuit held that it is an error of law for the district court to calculate the guidelines range for a crime involving cocaine base, as opposed to cocaine powder, by using ratios different from those mandated by the Guidelines.  The court noted, however, "By the same token, we do not intend to diminish the discretion that, after <u>Booker</u>, district courts enjoy in sentencing matters or to suggest that, in a drug-trafficking case, the nature of the contraband and/or the severity of a projected guideline sentence may not be taken into account on a case-by-case basis."  <u>Id.</u> at 65.

Mr. Custer suggests that the severity of the guidelines sentence overstates the degree of punishment warranted on the facts of his case.  The disparity in the Guidelines between powder and crack cocaine is based on Congress's core concern that crack cocaine poses "more serious societal danger" than powder cocaine; in particular, that crack cocaine "was more likely to (i) induce addiction; (ii) correlate with the incidence of other serious crimes; (iii) implicate especially vulnerable members of society; (iv) cause deleterious physiological effects; and (v) attract youthful users."  <u>Pho</u>, 433 F.3d at 55

(citing U.S. Sentencing Comm'n, Special Report to Congress: Cocaine and Federal Sentencing Policy 117-18 (1995)).

Whatever general truth these concerns may have, several of these factors are notably absent in the present case. There is no evidence that Mr. Custer's activities involved violence, threat of violence, theft, or other serious crimes. There is no evidence that Mr. Custer used or carried a firearm or other weapon. There is no evidence that his customers were vulnerable or underage. In short, the nature of Mr. Custer's criminal activity, notwithstanding the fact that it involved crack cocaine, simply does not warrant a sentence twice as long as the sentence that would be recommended under the Guidelines if his conduct had involved the same quantity of powder cocaine.

2.   *Disparities Among Co-Defendant and Uncharged Participants*

This Court presided at the trial of co-defendants Tejeda and Figueroa, who were found guilty by a jury. Mendes, Alves, and Pavao, like Mr. Custer, have pled guilty. Co-conspirator Amanda Eldridge was never indicted. This Court may appropriately consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a).

As Mr. Custer is the first defendant of the group to be sentenced, he is at a disadvantage in arguing the severity of his sentence vis-à-vis others involved in the same conspiracy. However, a few general observations can be made at this juncture. Mr. Custer certainly has a lesser degree of culpability than Mendes, the leader of the conspiracy, or Tejeda, the sole supplier of the drugs. Mr. Custer also has a lesser role than Figueroa and Alves, who controlled the drugs and money and basically managed the conspiracy for Mendes. Indeed, Mr. Custer's participation in the conspiracy could be

14

compared with Eldridge, whose role in making trips to New York was assumed by Mr. Custer, and she has not even been charged.

Finally, this Court currently has under advisement the motion of Tejeda and Figueroa, arguing that the Government failed to prove at their jury trial that the offense involved crack, as opposed to cocaine base. Mr. Custer has filed a similar motion. See n.4, supra. To the extent the co-defendants' motion succeeds because of the idiosyncratic manner in which the evidence was presented at trial, Mr. Custer should also be entitled to the same result, lest he be penalized for having pled guilty. The Court should take all these factors into account in arriving at a just sentence for Mr. Custer.

III. DEFENDANT'S SENTENCING RECOMMENDATION IN LIGHT OF SENTENCING PURPOSES OF 18 U.S.C. § 3553(a)(2)

Mr. Custer submits that a ten-year is sufficient based on the facts of the case, his history and characteristics, the sentencing options available, and the need to avoid unwarranted sentencing disparities in order to: "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public for further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2). In determining the minimally-sufficient sentence, the Court must essentially ask whether a more severe sentence would achieve greater justice, deterrence, incapacitation, or rehabilitation.

A ten-year sentence will amply serve society's interest in just punishment and deterrence. Such a sentence will result in Mr. Custer's release from prison at the age of 38, effectively incapacitating him for a significant period of time. Any longer sentence, however, would thwart the other important societal interests that the Court must also take

into account, including the need to promote respect for the criminal justice system, to address Mr. Custer's rehabilitation through mental health treatment and vocational guidance, and to achieve the ultimate long-term goal of protecting public safety.

In the period after he was arrested, but was still at liberty on bail, Mr. Custer demonstrated a respect for the criminal justice system. Not only did he prove himself capable of avoiding criminal activity, he also actively assisted the Commonwealth of Massachusetts in prosecuting a criminal case tangentially related to the case now before the Court – the murder of Daniel Mendes. Yet the Government has not given Mr. Custer any credit for this exemplary conduct. This Court should nonetheless consider Mr. Custer's cooperation with law enforcement and reward him with a sentence below the guideline range, a clear indication that his criminal sentence recognizes respect for the law as an important goal. "A defendant's assistance to the government is also relevant to the factors delineated in § 3553(a)(2), particularly the need for the sentence to promote respect for the law and to provide just punishment, to afford adequate deterrence, and to protect the public." United States v. Doe, 398 F.3d 1254, 1260 (10th Cir. 2005). See also United States v. Santamaria, 788 F.2d 824, 827 (1st Cir. 1986) (citing Roberts v. United States, 445 U.S. 552, 556-61 (1980), for the proposition that "cooperation with the authorities is a laudable endeavor that bears a rational connection to a defendant's willingness to change his behavior").

Moreover, Mr. Custer proved himself, in his small window of opportunity, able to conduct himself in a productive manner. Indeed, his employer is on record as stating that he was "always on time," "had great ability and drive to do his job," and was "always reliable." PSR ¶ 155.

A ten-year sentence will further give Mr. Custer the incentive to finally address the underlying mental-health conditions at the root of his criminal conduct. As Dr. Ebert concluded, Mr. Custer suffers from post-traumatic stress disorder and generalized anxiety order, attributable to any or all of the traumatic events of his youth: the murder of his brother, the loss of the family home, the murder of his good friend. In addition, he suffers from psychoactive substance abuse, with its direct correlation to his criminal conduct. "He has never received (or accepted) treatment for his problems, yet with appropriate medication and counseling, these problems can be readily treated. With such treatment he could begin to face his low self esteem and chronic underachievement and be in a position to rehabilitate himself and re-enter society." Letter of Dr. Ebert at 1-2.

Thus, mental health treatment, accompanied by vocational training in prison, would substantially address the § 3553(a)(2) interests in rehabilitation and, by implication, protecting society. However, Mr. Custer's incentive to engage in such productive conduct in prison is inversely proportional to the length of his sentence. With the prospect of release while he is still in his early 40s, with some prospect of a productive life before him, Mr. Custer will have the incentive to address his conduct and its causes. Conversely, if he cannot look forward to release until he is in his mid to late 50s, the benefit of such work becomes far less apparent.

IV.    CONCLUSION

For the foregoing reasons, a term of ten years, while below the guidelines range, is the sentence "sufficient, but not greater than necessary" to fulfill the purposes of criminal sentencing – punishment, deterrence, incapacitation, and rehabilitation – in Mr. Custer's case.

Respectfully submitted,

CHRISTOPHER CUSTER

By his attorney,

/s/ Mark D. Smith
Mark D. Smith, BBO # 542676
Laredo & Smith, LLP
15 Broad Street, Suite 600
Boston, MA 0210911
(617) 367-7984

Dated:  March 28, 2006