IN-HAND

# Commonwealth of Massachusetts

BARNSTABLE, SS.                                              SUPERIOR COURT

*To the Sheriffs of our several Counties, or their Deputies, any State Police Officer, the Constables or Police Officers of any City or Town in the County of Barnstable GREETING:*

You are hereby commanded to summon

**Christopher Custer**
**18 Murphy Lane**
**Hyannis, MA 02601**

*(if she/he may be found in your precinct) to* appear before the *SUPERIOR COURT* next holden at Barnstable within and for our County of Barnstable on **Monday, November 8, 2004, at nine o'clock in the forenoon and day to day,** then and there to give such evidence as she/he knows relating to any matters which may be inquired of on behalf of the Commonwealth before said Court or the Grand Jury, in the matter of **Commonwealth v. Kevin D. Haliday, Criminal Docket Number 0372CR00019 (01-05).**

HEREOF FAIL NOT, and make due return of this Writ, with your doings thereon, into the said Court.

WITNESS, my hand, at Barnstable in the County of Barnstable the **15th** day of **October**, in the year of our Lord two thousand and four.

_____
Michael O'Keefe, District Attorney

FEB-27-2006   10:41        CAPE&ISLAND'S DA'S OFFICE              15083628221        P.04

2004

By virtue of this precept I this day summoned the within named

by reading the same to her/him in her/his presence and hearing--
by giving in hand to her/him a true and attested copy of the same--
by leaving a true and attested copy of the same at her/his last and usual place of abode known to me as such.

*FEES*

Service ....................
Travel    miles ..........
Copy   ...................

$ _____

*Deputy sheriff*
*State Police Officer*
*Constable*
*Police* Officer of the--City--Town
of

No. 0372 CR 00019 (01-05)

COMMONWEALTH

VS.

KEVIN D. HALIDAY



THE COMMONWEALTH OF MASSACHUSETTS

OFFICE OF THE

## DISTRICT ATTORNEY

CAPE & ISLANDS DISTRICT

MICHAEL D. O'KEEFE
DISTRICT ATTORNEY

3231 MAIN STREET
P.O. BOX 455
BARNSTABLE, MA 02630
(508) 362-8113

August 17, 2005

Mark Smith, Esq.
Laredo & Smith, LLP
15 Broad Street
Boston, MA 02109

RE: Commonwealth v. Kevin Haliday
Criminal Docket No. 0372 CR 00019
<u>Barnstable County Superior Court</u>

Dear Mr. Smith:

Per your request, please be advised that Christopher Custer was called as a witness and testified in the Barnstable County Superior Court matter of Commonwealth v. Kevin Haliday.

Very truly yours,

Brian S. Glenny
First Assistant District Attorney

BSG/bs

Trial by Jury
DATE: 11/8/04, 11/9/04, 11/10/04, 11/12/04, 11/15/04, 11/16/04

CRIMINAL

COMMONWEALTH

No. 03-019-01
03-019-02
03-019-03
03-019-04, CT III
03-019-05, CT I, II

vs.

(Defendant) KEVIN D. HALIDAY

Commonwealth's Witnesses

Desiree Alves
Andrew Mendes
Carmen Figueroa
Christopher Standish
Monte Gilardi
Christopher Custer
Richard Evans
Michael Fernandez
Raynel Francis
Etienne Elichelt

Defendant's Witnesses

Kevin D. Haliday

EXHIBITS

No. 1 Posterboard with Photos
#2 Consent for search
#3A Photo (shell casing)
#3B Photo (shell casing, close-up)
#4 Posterboard (5 photos)
#5A Photo (shell)
#5B Photo (shell)
#5C Photo (shell)
#6A Photo (crib)  #6B Photo (floor)
#7 "GAP" bag
#8 Documents (gun purchase)
#9 Posterboard (9 photos)
#10 Knife
#11 Posterboard (Mgf)
#12A Drugs (small packets)
#12B Drug cert for Exh. #12A
#13 Bullet

I.D.

"A" Cassette tape (NW Ext #19)
"B" Transcript of "A"
"C" Various articles of clothing
"D" Various articles of clothing

JUDGE: Gary A. Nickerson    STENOGRAPHER: Daniel Horgan
Assistant District Attorney: Brian S. Glenny    Assistant Clerk: Scott D. Colson / Scott Nickerson-clerk
Defense Counsel: Peter J. Muse

I.D.'s B, C, and Returned to Sgt William Burke after verdict.

## CAPE COD TIMES
Friday, May 20, 2005

news | arts | sports | biz | weather | classifieds | subscribe

Archive help
Archive fees
Search archives
Recent 7 days
Buy photos

News
Business
Entertainment
Local news
Obituaries
Opinion
Sports
Weather

Food
Forums
Health
Lottery
Movies
Outdoors
PrimeTime
Weddings

Automotive
Classifieds
Dining Guide
Employment
Real Estate
Subscribe

### Cape Cod Times Archives

### Murder trial told how guns bought
By KAREN JEFFREY
Published: November 10, 2004
BARNSTABLE - The gun used to kill Daniul **Mendes** was bought by his cousin during a quick trip to Atlanta, according to testimony yesterday in Barnstable Superior Court.

Kevin Haliday28, bought that gun and two others over the 2002 Thanksgiving weekend, said Raynell Francis, a childhood friend of both **Mendes** and **Haliday**.

**Haliday** has pleaded innocent to murder. His attorney described the shooting that took place inside a friend's Hyannis home as accidental.

Francis told jurors yesterday that he helped **Haliday** purchase the guns - a .380 caliber pistol and two 9 mm pistols - by pretending the guns were for him.

**Haliday**, 28, is charged with murder in connection with the Dec. 11, 2002, shooting of **Mendes**, a young father and construction worker who died two days later at Cape Cod Hospital. According to the autopsy, **Mendes** was killed by a single gunshot wound to the head. A .380 caliber round was recovered from his skull during the autopsy. He was 25.

Francis, who grew up in Mashpee, was living in Atlanta in 2002. He described himself as a childhood friend of both **Mendes** and **Haliday**.

Francis said in November 2002 he returned to the Cape to visit family and friends at Thanksgiving. When it was time to return to Atlanta, **Haliday** accompanied him and two women on the drive back, Francis told jurors. When they reached Georgia -some 21 hours after leaving the Cape - **Haliday** asked for his assistance in getting guns, Francis said.

Although **Haliday** was a student at Bridgewater State College in 2002, Francis said he was also a drug dealer - a description bolstered by **Haliday**'s previous convictions for drug dealing as well as a pending drug charge.

Francis said **Haliday** claimed he needed guns to protect his business.

According to Francis, **Haliday** gave him $600 to buy the guns and returned to the Cape before the purchase was complete. Francis testified he took a bus from Atlanta to Boston, carrying the guns and two boxes of ammunition.

After getting a ride to the Cape with mutual friends, Francis said he turned over the guns and ammunition to **Haliday** upon reaching Hyannis.

So far, the prosecution has not offered a possible motive for the shooting,

but according to the law, it is not necessary to prove motive to secure a murder conviction.

Yesterday, jurors heard that the night before the shooting, **Mendes**, **Haliday** and other friends went to the Foxwoods Resort Casino in Connecticut where they gambled.

Chris **Custer**, a long-time friend of the two cousins, testified that on Dec. 10, 2002, he and **Mendes** drove to the casino where they met up with **Haliday** and others.

In one of the few light moments in the trail, **Custer** admitted he enjoyed "too many of the free drinks" to gamble successfully that night.

**Mendes** won a couple of hundred while Haliday won nothing, he said.

Yesterday, jurors boarded a tour bus for a visit to sites associated with the shooting.

In Hyannis they visited the two-bedroom duplex on Bearse's Way where **Mendes** was shot; houses on Pontiac Street, Murphy Road and Crocker Street, where friends of the two men live, and **Mendes**' childhood home on LaFrance Street.

Before heading to Sagamore - they saw the ballfield where a fleeing **Haliday** was caught by police on the night of the shooting - jurors got a quick coffee break at the Donut Works on Route 28.

Testimony is scheduled to resume this morning.

Copyright, 2004, Cape Cod Times. All Rights Reserved.

---

Back to Cape Cod Times home page
Comments and suggestions: news@capecodonline.com or advertising@capecodonline.com
cape cod online | capeweek | primetime | on cape | cape cod times | classifieds
Copyright © Cape Cod Times. All rights reserved.

# Mother of slain teen responds

## Says her son was improving his life

By JACK PERRY
STAFF WRITER

MAY 16 1986

WEST HYANNISPORT — An 18-year-old West Hyannisport man had been "straightening out his life" before he apparently took a police officer's gun during a struggle and shot himself, the man's mother said yesterday.

Barry Bettencourt, 18, who was pronounced dead Tuesday night at Cape Cod Hospital, Hyannis, had been working with a construction crew as a framer for the past six months, his mother June Custer said yesterday.

Bettencourt also had taken his high school equivalency test and "was even attending church," Mrs. Custer said.

"Yes, he had been in trouble before, but so have a thousand other kids," Mrs. Custer said.

According to the Barnstable police, Bettencourt's sister, Stacey, 17, called Tuesday night to report that her brother was beating up his girlfriend. When the police responded, Bettencourt ran out a front door, knocking one police officer aside, according to the police.

Two police officers chased Bettencourt, catching him a short distance from the house, the police said. During a struggle with the police officers, Bettencourt grabbed Officer Scott Warmington's gun from its holster without Warmington knowing it, the police said.

The gun discharged while Warmington was trying to handcuff Bettencourt, who was on the ground, the police said. Bettencourt received one shot to the chest from a .38-caliber revolver.

Mrs. Custer said she believes the police were wrong to chase her son. She said he would be alive today if they had let him go.

"It was simply a fight that got blown out of proportion, a series of events that led up to the accident that nobody witnessed," Mrs. Custer said.

"You can say that it was Barry's fault, you can say that it was the police's fault," Mrs. Custer said, "but it was just an argument that got carried away and through a series of events this happened."

While Mrs. Custer stood in the kitchen, her daughter Stacey, 17, and Barry's girlfriend, Helyne Cooper, 18, sat at the kitchen table.

Although police maintain that Stacey called and told them that Bettencourt was beating up Miss Cooper, yesterday Miss Cooper said, "All I want you to write is he did not beat me up. That was not true. We had an argument. He did not beat me up.

"I just want everybody to know that I loved him and was proud of him," she said.

Stacey Bettencourt also said that her brother was not beating up Miss Cooper, but that she thought the argument was serious enough to call the police.

"They were yelling at each other," she said. "People have tempers. You didn't know what could happen."

Miss Cooper said she and Bettencourt have dated steadily for the past two years. She said she plans to go to college this fall, and she and Bettencourt hoped to get married after she graduated.

Miss Cooper said she encouraged Bettencourt to join the Marines, because it would be "a really good start for him." Bettencourt planned to join the Marines this fall, she said.

"We were really good friends," Miss Cooper said. "I've never been able to get close to anyone. The first time we met we really hit it off. It was like we were married."

Bettencourt had dropped out of Cape Cod Regional Technical High School, but had recently taken night school courses and had taken a high school equivalency test. The results haven't been mailed back to the house yet, Mrs. Custer said.

"The whole family loved him," Mrs. Custer said. "Every family has problems, but they deal with them in their own way.

"The boy had a really hard life," she said. "He had nine major accidents, including being run over by a truck when he was 9 years old."

Mrs. Custer said the construction company her son worked for will soon play a softball game to raise money for the Special Olympics. It was Bettencourt's idea to play the game, she said.

Mrs. Custer also said she believes that the press "has blown the story out of proportion," and that she thinks the police should not have said anything about the incident until the investigation was complete.

"We ask that people just go away and leave us alone and let us deal with our tragedy," Mrs. Custer said.

# Man dies from gunshot in struggle with police

By JACK PERRY
STAFF WRITER    MAY 14 1986

WEST HYANNISPORT — An 18-year-old West Hyannisport man died early last night after he apparently grabbed a police officer's gun and accidentally shot himself during a scuffle with three Barnstable police officers, officials said.

Barry Bettencourt, 18, of 33 Grouse Lane, received one shot to the chest from a .38-caliber revolver, officials said. Bettencourt was pronounced dead in Cape Cod Hospital's emergency room, officials said.

Bettencourt's younger sister called the Barnstable police and told the dispatcher that her brother was beating up his girlfriend at the Bettencourt's Grouse Lane home, Cape and Islands First Assistant District Attorney W. James O'Neill said during a press conference last night at the Barnstable Police Facility.

Three Barnstable police officers, in separate cruisers, responded to the home, officials said. The call was made at about 6:42 p.m., officials said.

While the officers were talking to Bettencourt, he ran from the house and the police officers followed, officials said. The police caught up to Bettencourt a short distance from the house and struggled with him, officials said.

Bettencourt apparently removed

See MAN SHOT, Page 12

# ...Man shot in scuffle

From Page 1    MAY 14 1986

Officer Scott Warmington's revolver from its holster and shot himself while wrestling with the officers, officials said.

Sgt. William Packer and another patrolman were also struggling with Bettencourt when the shooting occurred, officials said.

Barnstable Police Chief Neil A. Nightingale said a Barnstable police sergeant patrols in a cruiser at all times and that he responds to most calls. He said more police officers are shot and killed responding to domestic calls than to any other type of police call.

"It's unfortunate that a young man is dead," Nightingale said, "but it's also fortunate that a police officer wasn't killed."

Warmington has been with the Barnstable Police Department since June 1985, Nightingale said.

Nightingale said an internal investigation is taking place. O'Neill said his office also is investigating the shooting. An autopsy is scheduled for this morning in the Southern Mortuary in Boston.

O'Neill said all information given last night was based on a preliminary investigation.

When the Hyannis Rescue Squad arrived, Bettencourt's body was about 15 feet off the road in brush, paramedic Tom Kenney said. Police officers were trying to revive Bettencourt, Kenney said.

Rescue squad workers continued the resuscitation efforts, Kenney said. They injected intravenous fluids, putting a tube down his throat so he would receive oxygen, Kenney said. They also put "shock trousers" on Bettencourt to keep blood circulating to his brain, heart and kidneys, Kenney said.

The rescue squad reached Bettencourt within four minutes of getting called and got him to the hospital within 19 minutes of being called, Kenney said.

Bettencourt wasn't breathing, and his heart wasn't beating, Kenney said.

"It was a valiant effort on everybody's part," he said. "The system worked perfectly," but Bettencourt was wounded too seriously to save.

The wound ripped out the back part of Bettencourt's heart, filling his chest with blood, Kenney said. Emergency room doctors opened up his chest to try and repair the heart, he said.

"If it (the shooting had) happened in the operating room, you couldn't have done anything about it," Kenney said.

# DA exonerates policemen in teen's death

## Victim held gun at time of shooting

By JACK PERRY  
STAFF WRITER

JUN 1 1 1986

BARNSTABLE — An 18-year-old West Hyannisport man, shot and killed last month during a struggle with two Barnstable police officers, was holding an officer's gun when it discharged and killed him, officials said yesterday.

A Cape and Islands district attorney's office investigation into the May 13 death of Barry Bettencourt of 33 Grouse Lane found that the officers involved "acted responsibly and properly," District Attorney Philip Rollins said at a press conference.

Results of tests performed at the FBI laboratory in Washington, D.C., indicate that Bettencourt was holding Barnstable Patrolman Scott Warmington's gun — a standard-issue Smith and Wesson .38 — in his right hand when the gun discharged, officials said. The same tests found no proof that any of the three officers present were holding the gun, officials said.

The gun discharged while Warmington and Sgt. William Packer were trying to handcuff Bettencourt, who was face down in an area of brush and trees across the street from his Grouse Lane home, according to a report prepared by Cape and Islands First Assistant District Attorney W. James O'Neill.

The police went to the Grouse Lane house after Bettencourt's sister, Stacy D. Bettencourt, called the police and told the dispatcher that Bettencourt was beating up his girlfriend, officials said.

Investigators said they were unable to determine whether Bettencourt pulled the gun from Warmington's holster or whether the gun fell out of the holster.

Warmington told investigators that he did not draw his gun, and that he had kept the holster buttoned, officials said. Warmington did not know how the weapon had been removed until after the gun was fired, officials said.

Packer and Patrolman Mark Rathbun, another witness to the incident, said they did not see Warmington remove the weapon from its holster and did not know how Bettencourt got the gun, officials said. Rathbun also responded to the call but was not involved in the struggle, officials said.

Trooper James O'Connor of the state police Crime Prevention and Control unit headed the investigation for the Cape and Islands district attorney's office. The Barnstable County Sheriff's Department and the Barnstable Police Department also took part in the investigation.

The investigation included interviews with all potential witnesses, specifically the three officers who responded to the call, the adult occupants of the house and neighbors, according to O'Neill's report.

Nobody interviewed saw how Bettencourt got the gun, officials said.

Barnstable Police Chief Neil A. Nightingale said the investigation showed the police officers did "what they were trained to do and the way they were trained to do it."

"It's unfortunate that a young man is dead, but, in my opinion, when he took that weapon, he had one intention and that was to commit a major act of violence either on himself or the officers," Nightingale said.

"We're very fortunate we don't have a dead policeman, or two dead policemen, or more," he said.

Bettencourt's mother, June Custer, yesterday criticized the Barnstable Police Department's handling of publicity on the case and the way the news media covered the event. She said the Barnstable police should not have commented to the press until after the investigation was completed.

"It's over and done with. I have a family who should be able to live their lives without being hounded by the press," Mrs. Custer said.

At 6:38 p.m. on May 13, Stacy Bettencourt called the Barnstable police from a nearby pay telephone and told Patrolman David Cameron that Bettencourt was beating his girl-

# DA exonerates policemen in teen's death

friend, officials said. That conversation was recorded and a transcript of that call was made available to the press yesterday.

After Packer approached the 33 Grouse Lane home from the side, Bettencourt ran inside through the side door, then ran outside through the front door, where he ran into Warmington, knocking him off balance, O'Neill's report said.

Warmington told Bettencourt to stop and started to chase Bettencourt, who was running across the street, O'Neill's report said. Warmington tackled Bettencourt in an area of trees and brush about 153 feet from the 33 Grouse Lane home, the report said.

About two seconds after Warmington tackled Bettencourt and was struggling with him on the ground, Packer arrived and Packer and Warmington tried handcuffing him, officials said.

Bettencourt continued to struggle, and while Packer had hold of Bettencourt's left arm, Warmington reached over with his left hand and grabbed Bettencourt's left hand or wrist with his right hand, O'Neill's report said. Bettencourt was still struggling when the gun discharged, the report said. Warmington then saw blood on Bettencourt's arm and a gun in his hand, the report said. He then noticed his gun was missing, the report said.

The struggle lasted about 30 seconds, "the best we can figure," O'Connor said. "It is a very difficult thing if somebody doesn't want to be handcuffed," he said.

The bullet passed from the right side of Bettencourt's chest to the left, traveling from front to back at a slightly upward angle, O'Neill said. The wound was "consistent" with the gun being held in Bettencourt's right hand, O'Connor said.

Warmington carries his holster on the right side, O'Neill said. The holster is designed to prevent anyone pulling the gun out from behind the officer, but "when the weapon is pulled from the front or the side, it will come out easily with little effort," according to O'Neill's report.

Barnstable County Investigating Officer Peter S. Robbins and O'Connor conducted experiments on Warmington's holster, according to O'Neill's report.

"These officers judged that Bettencourt was in the position to and could have reached his right hand easily into Warmington's holster and could have gained possession of the weapon in that manner," O'Neill's report said.

Robbins also sent samples from the hands of Packer, Warmington and Bettencourt for an atomic absorption analysis at the FBI laboratory in Washington, D.C., according to O'Neill's report.

These tests determine the presence of gun shot residue, and the FBI investigation indicated the presence of antimony and barium on Bettencourt's hands, but none on the officers,' O'Neill's report said. Antimony and barium can be deposited on the hands when a firearm is discharged, the report said.

# Shooting probe under way

## Victim grabbed gun, police say

By JACK PERRY
STAFF WRITER    MAY 15 1986

HYANNIS — A West Hyannisport man who apparently shot and killed himself with a police officer's gun Tuesday night took the gun out of a police officer's holster without the police knowing it, Barnstable Police Chief Neil A. Nightingale said yesterday.

While struggling with Sgt. William Packer and Officer Scott Warmington, Barry Bettencourt, 18, of 33 Grouse Lane, took Warmington's gun from its holster, Nightingale said. Warmington was trying to put handcuffs on Bettencourt, who was on the ground, when the revolver discharged, Nightingale said.

"They had no idea this guy had a gun," Nightingale said.

Bettencourt received one shot to the chest from a .38-caliber revolver and was pronounced dead last night at Cape Cod Hospital, Hyannis, officials said.

Preliminary autopsy results show that the bullet traveled up through Bettencourt's heart, from the right to left, according to Cape and Islands First Assistant District Attorney W. James O'Neill.

O'Neill said the autopsy, performed by the state medical examiner's office at Southern Mortuary in Boston, showed there were powder burns near the wound, which would indicate that the revolver was held close to the victim's body, possibly touching it, he said.

"As a result of a struggle, he was able to obtain the officer's weapon," O'Neill said. "At this point, it would just be guesswork to say what his intentions were."

According to Nightingale, Bettencourt's sister called the Barnstable Police Department at 6:42 Tuesday evening and told the dispatcher that Bettencourt was beating his girlfriend at the 33 Grouse Lane home where Bettencourt lived.

Bettencourt's sister also said that her 2-month-old baby was in the house, Nightingale said. Although there is no indication that Bettencourt harmed his sister or her daughter, officials said that the case was considered more urgent because an infant was in the house.

"(The women) were in fear, so to speak," Barnstable Police Lt. William Arthur said. "He had already assaulted one girl."

Packer and Warmington, in separate vehicles, responded to the call, Nightingale said. When the police reached the area, Bettencourt tried to run out a side door, but went back inside the house after seeing Packer. He then ran out the front door, where he knocked Warmington aside and continued running, Nightingale said.

The police officers followed, reaching Bettencourt a short distance from the house, Nightingale said.

Although earlier reports indicated that three police officers were struggling with Bettencourt, it was just Warmington and Packer, Nightingale said. Officer Mark Rathbun also responded to the call, but he had just pulled up in his cruiser and was approaching the men when the gun discharged, Nightingale said.

See SHOOTING, Page 9

## ...Police: Victim grabbed officer's revolver

From Page 1    MAY 15 1986

After hearing the shot, police officers rolled Bettencourt over and found the gun under him, Nightingale said. They started cardiopulmonary resuscitation, he said.

The police had responded to the call knowing there were two outstanding warrants for Bettencourt's arrest, Nightingale said.

Arthur said Packer radioed the station to confirm that there were warrants while he was traveling to the Grouse Lane home. One warrant was for failure to appear in court on a charge of driving under the influence of alcohol, while the other was for driving after his license was revoked, Arthur said.

"He was no stranger," to the police, Arthur said, but he would not elaborate.

Arthur said it would be "very difficult," although not impossible, for a person to take a police officer's revolver from its holster. Even if the holster were unbuttoned, a police officer could stand on his head while wearing the holster and the gun would not fall out, he said.

The holsters are designed so that police officers are protected from having anyone take the gun from behind or from beside them, O'Neill said. The least difficult way to remove the gun would be from the front, O'Neill said.

"When you get into that kind of a struggle ... the holster doesn't protect you from the front," O'Neill said.

O'Neill said an FBI laboratory in Washington would perform atomic-absorption tests on samples from the hands of Bettencourt and the police officers to try to determine who fired the gun.

Within two weeks, the district attorney's office hopes to have a "full and complete, detailed" report on the shooting, O'Neill said. All evidence the district attorney's office has received so far indicates that the shot was accidently self-inflicted, O'Neill said.

All three officers are still on regular duty, Nightingale said. The Barnstable Police Department is also conducting an internal investigation to determine whether the officers acted "in a proper manner," followed department policy, and whether there was any criminal wrongdoing, Nightingale said.

"We've found nothing so far to indicate they've done anything wrong," Arthur said.

Further autopsy tests will include toxicology tests to determine whether Bettencourt was under the influence of drugs or alcohol, O'Neill said.

Trooper James O'Connor of the state police Crime Prevention and Control unit is in charge of the investigation for the Cape and Islands district attorney's office, O'Neill said.

COMMONWEALTH OF MASSACHUSETTS
C&C Constables & Associates
Constables, Auctioneers, Professional Process Servers
P.O. Box 4393, Peabody, MA 01961
Tel. 508-977-9910   Fax 508-977-0014

Date: October 11, 1994

TO: June and Frank Custer
    33 Grouse Lane
    W. Hyannisport, MA

PURSUANT TO M.G.L. CHAPTER 357, S:2, BY VIRTUE OF EXECUTION NO. 9425SU2314 ISSUED BY THE Barnstable District COURT.

YOU ARE HEREBY NOTIFIED THAT ON THE 14th DAY OF October, 19 94 AT 9:00 A.M./P.M. XXXXXXX I WILL SERVE AND LEVY UPON SAID EXECUTION AND PHYSICALLY REMOVE THE DEFENDANT AND HIS OR HER PERSONAL PROPERTY FROM THE SAID PREMISES, IF THE SAID DEFENDANT HAS NOT PRIOR TO THE TIME VACATED THE SAID PREMISES VOLUNTARILY.

*[signature]*

CONSTABLES & ASSOCIATES
BOX 4393
PEABODY, MA 01961

RUSS MOVERS
210 BROADWAY, EVERETT, MA BOND #262556
OR 30 TERMINAL ST., CHARLESTOWN, MA BOND #68108365
TEL. 617-322-7373

| Trial Court of Massachusetts District Court Department | DATE FILED 5/16/94 | TIME STANDARDS TRIAL REQUEST DEADLINE | DOCKET NUMBER 9425SU 2314 |
|---|---|---|---|
| | PLAINTIFF Federal Home Loan Mortgage Corp. | | DEFENDANT June and Frank Custer |
| Barnstable District Court Route 6A Barnstable, Ma. 02630 | PLAINTIFF ATTORNEY John S. McNicholas Kushner & Sanders 55 William St. Wellesley, Ma. 02181 | | DEFENDANT ATTORNEY PAUL E. FITZSIMMONS, E Six Main Street Hyannis, MA. 02601 |
| CONSTABLES & ASSOCIATES BOX 4393 PEABODY, MA 01961 | MONEY DAMAGE ACTION (TIME STANDARDS) ☐ Remand  ☐ District Court Filing  ☒☒ SUMMARY PROCESS | | ☐ VICTIM VIOLENT CRIME  ☐ OT CI |

## WRIT OF EXECUTION FOR POSSESSION OF LEASED OR RENTED DWELLING

- To the Sheriffs of the several counties of the Commonwealth or their deputies, or any Constable of any city or town within the Commonwealth:

The plaintiff named above has recovered judgment against the defendant for possession of the premises shown below, which were rented or leased for dwelling purposes.

WE COMMAND you, therefore, subject to the requirements of G.L. c. 235, § 23 and G.L. c. 239, § 3, to cause the plaintiff to have possession of the premises shown below without delay.

This execution is valid for **THREE CALENDAR MONTHS** only. It must be returned to the court along with your return of service within ten days after this judgment for possession has been satisfied or discharged, or after three calendar months if this judgment remains unsatisfied or undischarged.

| LOCATION OF PREMISES | 33 Grouse Lane W. Hyannisport, Ma. | | |
|---|---|---|---|
| FIRST JUSTICE WITNESS: JOSEPH J. REARDON | DATE OF ISSUE 9/30/94 | LATEST RETURN DATE 12/30/94 | CLERK MAGISTRATE OR ASSISTANT CLERK |

OFFICER'S RETURN          DATE OF SERVICE:

Fees ____

TOTAL FEES ____

SIGNATURE OF OFFICER

"At least forty-eight hours prior to serving or levying upon an execution for the plaintiff for possession of land or tenements rented or leased for dwelling purposes, the officer serving or levying upon the execution shall give the defendant written notice that at a specified date and time he will serve or levy upon the execution and that at that time he will physically remove the defendant and his personal possessions from the premises if the defendant has not prior to that time vacated the premises voluntarily.

"Said notice shall contain the signature, full name, full business address and business telephone number of the officer, and the name of the court and the docket number of the action, and shall be served in the same manner as the summary process summons and complaint.

"No execution for possession of premises rented or leased for dwelling purposes shall be served or levied upon after five o'clock P.M. or before nine o'clock A.M., nor on a Saturday, Sunday, or legal holiday.

"If the underlying money judgment in any summary process action for non-payment of rent in premises rented or leased for dwelling purposes has been fully satisfied, together with any use and occupancy accruing since the date of judgment, the plaintiff shall be barred from levying on any execution for possession that has issued and shall return the execution to the court fully satisfied . . . Notwithstanding this paragraph, the plaintiff shall not be required to accept full satisfaction of the money judgment."

EXCERPT FROM G.L. c. 239, 63